RECEIVED
JAN 0 7 2011
JAMES BONINI, CLERK
DAYTON, OHIO

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **CLAUDIO OCCHIONE,** | ) |
| | ) |
| | ) CASE NO.: 3 : 11 cv 005 |
| | ) JUDGE: THOMAS M. ROSE |
| **Plaintiff,** | ) SHARON L. OVINGTON |
| | ) |
| **vs.** | ) **COMPLAINT** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| **PSA AIRLINES INC. ET AL** | ) |
| | ) |
| **And** | ) |
| | ) |
| **JEFFREY GILLIAM, DARREN HARRIS,** | ) |
| **MATTHEW CHRISTNER, RANDALL FUSI,** | ) |
| **JOSEPH ROSE.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## I. INTRODUCTION

This is an action arising under state and federal law for national origin-based

termination and harassment, which was a part of a pattern and practice of

national origin discrimination against foreign born pilots, and other related

actions on the part of Defendants, including retaliation for complaining of

1

national origin discrimination, in violation of 42 U.S.C. 2000e et. seq., and Ohio public policy. These acts of discrimination took place at locations throughout the United States, and in particular in Dayton, Ohio, Seattle, Washington, and Charlotte. North Carolina.

## II.PARTIES

1. Plaintiff Claudio Occhione (hereinafter "Plaintiff"), is an Italian citizen who just became a US citizen in 2009 and has a very thick accent.

2. At all relevant times Plaintiff was a resident of Florida, Texas and domiciled in North Carolina for work. Plaintiff had been employed as a commercial pilot since 2001 and was a First Officer from 2001 to 2009. Plaintiff has worked for PSA Airlines Inc. as an Airline Pilot from July 5, 2004 until termination on June 1, 2009. In his years with PSA Plaintiff safely flew over 3600 hours.

3. Defendant PSA Airlines Inc. (hereinafter "PSA") is a Pennsylvania corporation and wholly owned subsidiary of US Airways Group.

4. PSA has over 500 employees and is and has at all relevant times been doing business in the State of Ohio. Defendant PSA has its corporate headquarters in Vandalia, Ohio at the Dayton International Airport. It operates under the name of US Airways Express.

5. Defendant PSA is an employer within the meaning of title VII of the Civil Rights Act of 1964 (hereafter "Title VII"), 42 U.S.C 2000e et.seq.

6. All the acts alleged herein were duly performed by and/or are attributable to Defendant, acting by and through their agents and employees.

7. Defendant is responsible for, or controlled, directed or ratified the discriminatory activity and is responsible for the unlawful actions taken against and/or suffered by Plaintiff.

8. Plaintiff alleges that each named Defendant negligently, willfully, intentionally, maliciously, recklessly or otherwise caused, directed, allowed or set in motion the unlawful and retaliating events affecting Plaintiff.

### III. JURISDITIONAL STATEMANT

9. Plaintiff hereby in bona fide contention that each allegation is true, brings this action pursuant to the common law of the State of Ohio and 42 U.S.C 2000e e et. seq. and 42 U.S.C. 1981a.

### IV. FACTUAL STATEMANT

10. Plaintiff Occhione has been flying since 1994, and has logged almost 7000 flight hours. During that time he had no FAA violations or letters of warning.

11. Plaintiff Occhione was the holder of an Airline Transport Pilot certificate with FAA ratings: Airplane Multiengine Land (ATP) with a CL-65 (Canadair Regional Jet) type rating as second in command (SIC), Instrument rated, Certified Flight Instructor (CFI), Certified Flight Instructor Instrument (CFII), Certified Flight Instructor Multiengine (MEI) and Ground Instructor certificate with advanced ratings issued in 1996 and almost 7000 flight hours.

12. Plaintiff Occhione was employed by PSA for approximately five years, as a pilot based at the PSA Charlotte, North Carolina facility, from July 5, 2004 until June 1, 2009. Prior to working at PSA, Plaintiff Occhione was employed as a pilot at Xtrajet in California and Cherry Air in Texas.

13. As a pilot, Plaintiff had a variety of duties, including primarily the safe operation of the aircraft to which he was assigned.

14. Beginning the course of Plaintiff's employment at PSA, he received excellent performance evaluations and was repeatedly praised by his managers for his safe and efficient work as a pilot. Plaintiff was

4

employed as a First Officer, meaning one of two pilots assigned to operate the aircraft on which he flew.

15. Beginning in or about September, 2007, Plaintiff applied for promotion to the position of Captain.

16. Plaintiff was well qualified for the position of Captain. He met and exceeded all entrance requirements for the position, which included passing a "ground school" conducted by PSA in Dayton, Ohio, where written tests were completed by captain applicants, and passing oral examinations.

17. In evaluating Plaintiff's applications for promotion to the position of Captain, PSA was required by published FAA regulation (the "Practical Test Standards" or "PTS") to follow well established procedures. These procedures included but were not limited to submitting each Captain applicant to a check ride, which is a simulated ride on one of the US Airways aircraft simulators. These simulators closely resemble and mimic operational characteristics of the aircraft type and model to be flown.

18. From 2007 to 2009, Plaintiff submitted to four check rides as a part of his effort to be promoted to Captain.

19. Objective criteria and witnesses who have testified under oath in a
related National Transportation Safety Board matter (Babbitt v.
Occhione, NTSB Docket # SE-18719, heard March 16-17, 2010)
show that Plaintiff either passed each of these check rides or was
unfairly denied the opportunity to complete these check rides.

20. The first of these check rides took place October 12, 2007. However,
Defendant PSA and its Aircrew Program Designee (hereafter "APD")
Jeffrey Gilliam improperly "downed" Plaintiff on this first Captain
upgrade. Defendants did so because they did not want foreign born
pilots, especially those with thick accents, acting as Captains of their
planes.

21. One example of the discriminatory treatment to which Plaintiff was
subjected on the first check ride was the fact that although Occhione
performed almost every aspect of the first check ride correctly, Mr.
Gilliam graded him as "full failure" meaning that he had to retest
every aspect of the test. This was different, upon information and
belief, than the test results for American born pilots.

22. Another example of the way in which Plaintiff was treated
discriminatorily on the first check ride was that he was not apprised of
his alleged failures until the check ride was completed, contrary to

6

Federal Aviation Regulations PTS policy (FAA) which requires that any failure during a check ride is to be communicated immediately to the pilot applicant who then decides whether to continue the test.

23. Plaintiff's check ride "re-test" took place on October 18, 2007. At that time, he was tested for only about five minutes. Defendant Darren Harris (APD) terminated the retest after telling Plaintiff he had failed the test for improper diagnosis of a generator relay failure. This was an improper basis to fail and to terminate the test because PSA pilots had not been trained on generator relay failures. Moreover, upon information and belief, other PSA Captain applicants were not tested on this particular scenario. As it happens, the generator relay failure used by APD Harris cannot be performed on the company computer-based training program used by PSA Airlines at its training facility in Dayton, Ohio. Finally, significantly and again in contravention of FAA PTS standards, the second check ride failed to test Plaintiff on any of the procedures which he had allegedly failed in the first.

24. During the course of the upgrade process that took place in 2007, Defendants made several comments to Plaintiff regarding his nationality and actively and affirmative slander and singling out for discrimination.

7

25. Defendants actively worked against the Plaintiff with fraudulent intentional efforts to prevent his advancement, whatever the cost.

26. PSA Airlines refused to advance Plaintiff in position and pay consistent with his performance on multiple check rides and on the line.

27. Plaintiff has come to learn that in the same period at least one other denial of promotion to a foreigner with an accent, APD Jeffrey Gilliam was the trainer or examiner.

28. Plaintiff was then placed on unpaid suspension.

29. Plaintiff was then "allowed" to return the line as First Officer only on December 3rd 2007.

30. On November 08, 2007, Plaintiff filed PSA Grievance 38-07 thru the Airline Pilot Association (ALPA) which was dead-locked (denied) by PSA.

31. During late 2007, all of 2008 and early 2009 Plaintiff was subjected to additional discriminatory and retaliatory acts which included requiring him to undergo drug testing on three occasions and placing him on an unpaid suspension. Although PSA has a random drug testing policy, prior to filing complaints of discrimination and FAA violations by PSA during 2007 , Plaintiff was never "randomly" tested. It is belief

that high seniority Captains at PSA were never "randomly" drug tested in twenty years.

32. On November 19, 2007, Plaintiff sent certified letters to PSA Director of Human Resources David Glenn, Chief Pilot Thomas Arline, Inspector William Best (FAA) and Fanny Rivera (FAA) claiming discrimination and breach of FAA regulations by PSA examiners.

33. Plaintiff was then sent back to the line as First Officer on December 3rd 2007.

34. Plaintiff filed his first EEOC charge against Defendant PSA Airlines Inc. in March 2008, alleging that he had been subjected to discriminatory treatment in violation of Title VII due to his national origin, including his thick accent.

35. On July 2008 in Charlotte NC Plaintiff was approached by a PSA employee who referred a message from Defendant Gilliam. That message was about Mr. Gilliam's intentions to report and turn in Plaintiff to the FAA and that he, APD Gilliam, was threatening to break the Plaintiff.

36. Subsequent to Plaintiff's third check ride, Defendant Matthew Christner, while evaluating his performance, altered the FAA forms 8065 which were to be used to record those parts of the check ride

which Plaintiff Occhione performed satisfactorily and those which he did not.

37. Upon sworn testimony in the above-cited NTSB proceeding, Defendant Joseph Rose (PSA Director of Operations) told another PSA employee (currently FAA Inspector) that PSA management "had it in" for Plaintiff Occhione.

38. Defendants Rose and Fusi collectively carried out a "plan of failure" for Occhione by requiring Defendants Gilliam, Harris and Christner to falsely evaluate Plaintiff's performances on his check rides. Such submission and acts by APDs Gilliam, Harris and Christner were wanton, intentional, tortious and fraudulent, as well as outside the legitimate course and scope of their employment.

39. On May 16 and 29, 2009 Plaintiff Occhione underwent his third and fourth check rides for upgrade to Captain. Present during the third ride was FAA Principal Operations Inspector Walter Sain. Inspector Sain stated in his report of that date, and in sworn testimony in the March 2010 NTSB hearing that Mr. Occhione "did not receive a fair check."

40. On June 1, 2009 Plaintiff was terminated from employment.

41. On June 10, 2009, Plaintiff Occhione filed his second EEOC charge alleging that he had been discriminated against in his check rides and

10

in the performance of his duties and in the denial of his promotion to the Captain position. The charge also alleged that Defendant engaged in a part of a pattern and practice of discrimination against persons of non-American national origin and was discriminating against him in retaliation for filing his first EEOC charge.

42. On June 29, 2009, Plaintiff filed PSA Grievance 2009-047 thru the Airline Pilot Association (ALPA). The decision was held due to Company research on new evidence presented by Plaintiff.

43. Less than ninety days before the filing of this complaint Plaintiff received right to sue letters on his EEOC charges.

44. Defendants' actions constitute harassment and discrimination within the meaning of Ohio public policy and Title VII of the Civil Rights Act of 1964.

45. In all four discriminating check ride environments provided by PSA, Plaintiff has never received an equal opportunity to upgrade even though he has been signed off four times by PSA Instructors to take this captain upgrade check rides without any problems.

46. PSA Airlines simply acted in retaliation for a variety of complaints submitted by Plaintiff thru the EEOC, DOL and FAA whistleblower

Hotline, therefore planned certificate action against the Plaintiff to harm his future as an airline pilot and as a human being.

47. PSA's actions have seriously damaged the Plaintiff's airman records, future career of employment and black balled him as a pilot for the rest of his life.

48. Plaintiff is unable to work or seek work as a pilot.

49. Plaintiff has lost all present and future income he would have generated as a Captain for PSA or with future employment as pilot for a different air carrier.

50. PSA Airlines fabricated and fraudulently planned and orchestrated termination of employment.

51. The alleged "failures to upgrade to the captain position" were fraudulently manipulated by PSA in collusion with two Federal Aviation Administration's (FAA) Inspectors who were in charge of overseeing PSA Airlines Operations.

52. Defendants along with the aforementioned Cincinnati FAA FSDO Inspectors conspired to suspend Plaintiff's pilot certificates in the attempt to cover the fact that discriminating and retaliating acts occurred at PSA and to prevent such facts from becoming apparent.

12

53. Plaintiff has suffered emotional distress, with resulting physical manifestations, caused by the hostile work environment and wrongful termination of employment.

## V.  LEGAL CLAIMS

**A.  PLAINTIFF FIRST CAUSE OF ACTION** – Wrongful Termination in Violation of Ohio Public Policy against Wrongful Discharge Based on National Origin.

54. Plaintiff repeats and incorporates herein the allegations of paragraph 1 through 53 as thought fully set forth below.

55. The public policy of the State of Ohio includes the prohibition against discriminating against employees because of their national origin, in violation of the policies expressed in the Ohio Revised Code §4112 et. seq.

56. In terminating Plaintiff in whole or in part because of his national origins, Defendant PSA Airlines Inc. violated the public policies of the State of Ohio.

57. As a result of Defendant's acts, Plaintiff has lost compensation and benefits, and suffered emotional distress.  Plaintiff is entitled to receive compensatory damages in an amount in excess of Ten Thousand Dollars ($10,000.00).

13

58. Defendant PSA's conduct was willful, wanton and in total disregard for the rights of Plaintiff which entitles the Plaintiff to recover punitive damages in an amount in excess of Ten Thousand Dollars ($10,000.00).

59. As a direct and proximate result of Defendant's conduct, Plaintiff has been forced to file legal action and thus is entitled to his attorney's fees and costs.

B. **PLAINTIFF'S SECOND CAUSE OF ACTION** – Wrongful Harassment and Termination in Violation of Title VII of the Civil Rights Act of 1964.

60. Plaintiff incorporates herein the allegations of paragraph 1 through 59 as though fully set forth below.

61. Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 et. seq. includes the prohibition against discriminating against employees because of their race or in retaliation for filing EEOC charges or otherwise opposing discrimination.

62. In harassing and then terminating Plaintiff in whole or in part because of his national origin, and then terminating Occhione and disciplining him in whole or in part because he filed an EEOC charge and because of his national origin, Defendant PSA violated 42 U.S.C. 2000e et.seq.

14

63. As a result of Defendant PSA's acts, Plaintiff has lost compensation and benefits, and suffered emotional distress. Plaintiff is entitled to receive compensatory damages in an amount in excess of Ten Thousand Dollars ($10,000.00).

64. Defendant's conduct was willful, wanton and in total disregard for the rights of Plaintiff which entitles the Plaintiff to recover punitive damages in an amount in excess of Ten Thousand Dollars ($10,000.00).

65. As a direct and proximate result of Defendant's conduct, Plaintiff has been forced to file legal action and thus is entitled to his attorney's fees and costs.

C. **PLAINTIFF'S THIRD CAUSE OF ACTION** –Intentional Infliction of Emotional Distress under Common Law. (IIED)

66. Plaintiff incorporates herein the allegations of paragraph 1 through 65 as though fully set forth below.

67. Defendant PSA Airlines's actions go beyond all possible bounds of decency, and are atrocious and utterly intolerable.

68. The actions of Defendant against Plaintiff described above were designed to inflict severe emotional distress upon Plaintiff.

69. Defendant PSA is liable to Plaintiff for the acts committed by its agents Gilliam, Harris, Christner, Fusi, Rose and Glenn by virtue of the doctrine of Respondeat Superior.

70. Plaintiff has suffered damages from Defendants' tortious conduct, including economic, pecuniary and emotional distress damages and far more importantly the ability to work in his profession.

71. Additionally, the conduct of Defendant and its employees has been malicious, fraudulent and was designed to annihilate Plaintiff's pilot profession thus Plaintiff is entitled to punitive damages under Title VII.

72. As a direct and proximate result of Defendant's conduct, Plaintiff has been forced to file legal action and thus is entitled to his attorney's fees and costs.

**WHEREFORE,** Plaintiffs demands a jury trial and prays that the following relief be awarded:

1. Actual, compensatory and punitive damages for Plaintiffs' first cause of action, Defendant PSA Airlines et al. violation of Ohio Revised Code §4112 et.seq;

2. Actual, compensatory and punitive damages for Plaintiff's second cause of action, violation of 42 U.S.C. 2000e et.seq.

16

3. Actual, compensatory and punitive damages for Plaintiff's third cause of action of Intentional Infliction of **Emotional Distress** under the Common Law.

4. Costs and attorneys fees in connection with this matter.

5. Other and further relief that the Court deems just and equitable.

6. That the Court retain jurisdiction over Defendants until all remedies are determined to be in full compliance with the law.

7. Extraordinary relief with the affirmative correction of his training and airman records to reflect his exemplary and consistent within-standards performance as a pilot at PSA Airlines during his 5 years of employment.

8. Extraordinary relief with the retraction of fraudulent statements and testimony given by PSA employees to/for the Federal Aviation Administration (FAA) of the Cincinnati Flight Standard District Office and the National Transportation Safety Board (NTSB).

9.

Dated This ___0 7___ day of Jannuary, 2011.

Pro Se
Claudio Occhione
P.O Box 245, Sharon WV 25134
Telephone 304-741-4547

17