**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CLAUDIO OCCHIONE, | : | |
| Plaintiff, | : | Case No. 3:11-cv-05 |
| -vs- | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Michael J. Newman |
| PSA AIRLINES, INC., | : | |
| Defendant. | : | |

**REPORT & RECOMMENDATION[1] THAT:
(1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 38)
BE GRANTED; AND (2) THIS CASE BE CLOSED**

This case concerns a pilot in a First Officer position who, on two occasions, voluntarily applied to be promoted to Captain, but failed to pass the required basic flight skills test four times. Under the governing collective bargaining agreement, the airline had discretion to terminate his employment. The airline did so for safety reasons, as it had done for every other pilot who had likewise failed the basic flight skills test multiple times.

Plaintiff -- who is Caucasian and an Italian-born United States citizen -- asserts that, under Title VII of the Civil Rights Act of 1964 and the Ohio Civil Rights Act, Defendant PSA Airlines, Inc. (Defendant or "PSA") discriminated and retaliated against him based on his race, citizenship and national origin by failing to promote him and terminating him.[2] Plaintiff also claims that he was subjected to a hostile work environment based on his national origin.

This matter is before the Court on Defendant's motion for summary judgment (doc. 38),

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendation.

[2]Plaintiff's other claims were voluntarily dismissed pursuant to Rule 41(a)(1)(A)(ii). Doc. 29.

Plaintiff's memorandum in opposition (doc. 42), and Defendant's reply (doc. 46). Having carefully reviewed the parties' memoranda and supporting evidence, the Court finds that no genuine issue of material fact exists, and Defendant's termination decision was neither discriminatory or retaliatory. Nor was Plaintiff subjected to a hostile work environment.

## I.  FACTUAL BACKGROUND[3]

### A.    The Parties

PSA, a regional airline and wholly owned subsidiary of U.S. Airways, operates 50-seat and 70-seat commercial jets, and is subject to Federal Aviation Administration ("FAA") regulations. Fusi Decl. ¶ 3, Doc. 38-3. Pursuant to FAA regulations, every commercial flight must have both a Captain and First Officer. *Id.* A Captain is first in command of the aircraft, crew and passengers, and is responsible for ensuring safe operation of the aircraft, as well as complying with PSA and FAA rules and procedures. *Id.* ¶ 5 & ex. 2. A First Officer is second in command and aids the Captain in performing his or her duties. *See id.* & ex. 1. A First Officer operates the aircraft only under the Captain's supervision. *Id.*

A collective bargaining agreement ("CBA") between PSA and PSA pilots' union, the Air Line Pilots Association International ("ALPA"), provides the procedure for upgrading from First

---

[3]The parties dispute the admissibility of Plaintiff's exhibits for summary judgment purposes. In its reply memorandum, Defendant argues that the Court should not consider the majority of Plaintiff's exhibits -- that consist primarily of unsworn statements and unauthenticated documents. Doc. 46 at PageID 851-54. After summary judgment briefing was completed, Plaintiff filed a motion for leave to file a declaration authenticating his exhibits. In a separate ruling (doc. 48), the Court denied that motion as moot because, for purposes of summary judgment, the Court liberally construed Plaintiff's documents in his favor. Plaintiff is also concerned with the authenticity of his "Exhibit R" -- a CD of unidentified recordings of conversations with a FAA inspector and PSA employees. The Court listened to the CD for purposes of ruling on summary judgment. Having reviewed all of Plaintiff's exhibits in his favor, the Court concludes that, even if all of Plaintiff's materials were properly authenticated, it would not change the outcome of this case -- that summary judgment should be granted in Defendant's favor.

Officer to Captain.  *Id.* ¶¶ 6, 10 & ex. 3.   The First Officer undergoes classroom training and must pass an oral examination.  *Id*. ¶ 8; Occhione Dep. 107-08, Doc. 38-2.  Then, the pilot is trained in a simulator, and must successfully complete an evaluation in the simulator, referred to as a check ride.  Fusi Decl. ¶¶ 8-9; Occhione Dep. 98-100 & ex. 6-A.  On each attempt to upgrade, the pilot has two opportunities to pass the check ride.  Occhione Dep. 98-99 & ex. 6-A.  Further, after each check ride, the pilot has an opportunity to be debriefed and review the procedures.  *Id.* at 127.

Under the CBA, if a pilot fails in his first attempt to upgrade, he or she will return to his former First Officer position if it is available, and must wait six months before bidding for an open Captain position.  Fusi Decl. ¶¶ 10-11; Occhione Dep. 99.  If a pilot fails in his or her second attempt to upgrade, it is in PSA's discretion how to deal with the pilot.[4]  *Id.* ¶ 11 & ex. 3; Occhione Dep. 100-01.  According to PSA, any such pilot is terminated or asked to resign.  Fusi Decl. ¶ 13; Glenn Decl. ex. 6, Doc. 38-4.

Plaintiff was born in Italy, but attended aviation school in the United States.  Occhione Dep. 23-24.  He obtained a "Green Card" in approximately 2003 or 2004, and became a United States citizen in February 2009.  *Id.* at 24-25.

### B.	Plaintiff's Early Employment at PSA

Plaintiff's employment with PSA began in July 2004.  *Id.* at 58.  Upon his hiring, PSA provided him with a copy of its Non-Discrimination and Non-Harassment Policy.  *See id.* at 81-83; Glenn Decl. ¶ 3 & ex. 2.[5]  The Policy provides that employees should report any discrimination or

---

[4]Accordingly, a pilot is afforded four opportunities to pass the check ride test -- two check rides for each of the two permissible attempts to upgrade to Captain.  As explained in more detail below, *see infra*, Plaintiff failed all four check rides.

[5]Though Plaintiff does not remember receiving it, PSA showed him a signed acknowledgment of receipt of the Policy, Glenn Decl. ex. 2, and he did not deny that it was his signature.  Occhione Dep. 81-83, 86.

3

harassment to the Employee Relations Specialist, Director of Human Resources, or PSA's Company President. Glenn Decl. ex. 1.

Plaintiff underwent three months of training to become a First Officer. Occhione Dep. 62. During that training, Plaintiff testified that his instructor made facial expressions, indicating that he did not understand Plaintiff's questions, in front of the class. *Id.* at 94-95. Plaintiff also claims that Captain Gilliam, who administered Plaintiff's First Officer simulator training, raised his voice when Plaintiff did not understand him, and was harder on him than on others in his class. *Id.* at 115-16, 118. At that time, he did not believe these incidents were related to his national origin, however. *Id.* at 118.

In 2005, while Plaintiff was acting as the First Officer on a flight, the Captain drove the airplane off the runway into the grass with passengers on board. *Id.* at 64-66. The Captain and Plaintiff were both placed on paid administrative suspension. *Id.* at 68-69. Plaintiff felt that, during the investigation of the accident, he was treated as an inferior pilot due to his accent. *Id.* at 90-91. Specifically, he testified that the PSA officials: made "a slang joke about something with a gate"; stared and acted like they did not understand him when he attempted to explain what happened; and made some comments about Italy that he could not recall. *Id.* at 92-93.

In addition, Plaintiff testified that, some time between 2004 and 2007, Captain Gilliam asked him if he was getting experience at PSA in order to find employment overseas. *Id.* at 120-21. Plaintiff did not think there was anything wrong that question, however. *Id.* at 121.

    **C.**    **Plaintiff's First Attempt to Upgrade**

In October 2007, Plaintiff requested to upgrade from First Officer to Captain. *Id.* at 87-88. He successfully completed the classroom training component. *Id.* at 107; Fusi Decl. ¶ 14. During

4

the training, another pilot, Mario Pompei, made comments about Plaintiff being Italian, including "you're Italian, you're hard headed," "you need to know things," and "you like digging into things." Occhione Dep. 108-09. Mr. Pompei also made fun of Plaintiff's accent, commenting that he had never heard such a "thick Italian accent." *Id.*

On October 12, 2007, Plaintiff had his first check ride. *Id.* at 123; Fusi Decl. ¶ 18. Plaintiff testified that Captain Gilliam, the Aicrew Program Designee ("APD")[6] who administered the test, told him that he looked like a "hit man" before his check ride. Occhione Dep. 123-25. According to Captain Gilliam's notes, Plaintiff committed several serious errors. *See* Fusi Decl. ¶¶ 18-20 & ex. 4. For example, when Plaintiff was presented with an engine failure, he incorrectly advised the acting First Officer to not shut the engine down, which could have created a serious safety issue on a real flight. *Id.* Consequently, Plaintiff failed his first check ride. Fusi Decl. ¶ 18.

Because he felt that Captain Gilliam improperly evaluated him, Plaintiff refused to be debriefed. Occhione Dep. 126-27. Plaintiff was frustrated that Captain Gilliam had not told him the exact sequence of events beforehand. *Id.* at 132-34. Therefore, Plaintiff called Manager of Flight Standards, Randy Fusi, to complain that Captain Gilliam improperly administered his check ride. *Id.* at 129-31; Fusi Decl. ¶ 22.

Plaintiff's second check ride took place on October 18, 2007. Fusi Decl. ¶ 22. Mr. Fusi assigned a different APD -- Captain Harris -- to evaluate Plaintiff, and also attended himself. *Id.* ¶¶ 22-23; Occhione Dep. 142-43. During the pre-briefing, Mr. Fusi, who is of Italian descent and speaks some Italian, told Plaintiff that he was a retired police officer, and commented "police are

---

[6]An APD is a PSA pilot who has been trained and authorized by the FAA to perform airman certification for PSA pilots. Fusi Decl. ¶ 17. The APD is acting on behalf of the FAA when evaluating the pilot. *Id.*

sh_t" in Italian. Occhione Dep. 144; Fusi Decl. ¶¶ 2, 23. In addition, while reviewing Plaintiff's Italian passport, Captain Harris made a facial expression and asked Plaintiff if he "did this legally" -- referring to his immigration status. Occhione Dep. 144.

Captain Harris ended Plaintiff's second check ride early due to Plaintiff's serious error. *See id.* at 146; Harris Decl. ¶ 5, Doc. 38-5. According to Captain Harris, Plaintiff was presented with a minor issue prior to engine start -- "an electrical malfunction for the left engine which resulted in generator number one failing to close." Harris Decl. ¶ 4 & ex. 1. While Plaintiff recognized there was a problem, he incorrectly "attempted to reset the number two generator on the right engine instead of the number one generator on the left engine." *Id.* Consequently, "the aircraft was left with no operating engine driven generator which took a very minor problem and elevated it to an emergency situation and a very serious safety risk." *Id.* ¶ 5.

Plaintiff claims that he was discriminated against because the "generator failure" scenario in his second check ride was not covered during his simulator training. Occhione Dep. 141-42. According to PSA though, a pilot is not trained on every possible scenario during simulator training. Fusi Decl. ¶ 28. Further, such a scenario is covered in PSA's ground school training, and is considered basic knowledge for pilots. *Id.* ¶¶ 27-28.

Therefore, after two unsatisfactory check rides, Plaintiff failed his first attempt to upgrade to Captain. *Id.* ¶ 29; Occhione Dep. 146-48. Under the CBA, he was permitted to return to his First Officer position and re-apply for an upgrade in six months. Fusi Decl. ¶ 30; Occhione Dep. 146-47.

### D. Plaintiff's Return to First Officer

Plaintiff underwent re-training to return to his First Officer position. Occhione Dep. 147-48. He does not recall any specific instances of national origin discrimination during that re-training.

*Id.* at 150.[7]

In 2007, following his failed upgrade attempt, Plaintiff sent letters to Director of Human Resources Dave Glenn, and PSA's Chief Pilot Thomas Arline, complaining that he was being discriminated against based on his national origin. *Id.* at 235-36.[8] Additionally, Plaintiff filed a union grievance, but it was later denied. *Id.* at 215-17; Fusi Decl. ¶ 31. Plaintiff also made a safety complaint to the FAA, alleging that PSA was not following FAA regulations, which was subsequently dismissed. Occhione Dep. 176, 183.

On March 11, 2008, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging national origin discrimination. *Id.* at 176; Glenn Decl. ex. 4.

Plaintiff testified that, in 2008, a PSA employee and friend of Captain Gilliam's, approached Plaintiff and said that Captain Gilliam had told him that he "was going to break [Plaintiff] and report [Plaintiff] to the FAA." Occhione Dep. 119, 227-28.

In May 2008, Plaintiff entered another upgrade class. *Id.* at 151-52. During the ground training, Mr. Fusi asked Plaintiff when he last visited Italy, whether his mother spoke English, and whether his mother visited him in the United States. *Id.* at 164-65. Plaintiff testified that he did not find these questions inappropriate, however. *Id.* at 165. PSA later cancelled that classroom training after determining that it did not have any vacant Captain positions. *Id.* at 153; Fusi Decl. ¶ 32.

E. **Plaintiff's Second Attempt to Upgrade**

Though not required to, Plaintiff applied to upgrade to Captain again in May 2009. Occhione

---

[7]Plaintiff was upset that PSA did not allow him to stay in Seattle, Washington (where he underwent his training to upgrade to Captain) to do his First Officer re-training, but he did not believe that the decision was based on his national origin. Occhione Dep.145- 46.

[8]Plaintiff never spoke to anyone else in PSA management about national origin discrimination. Occhione Dep. 236.

7

Dep. 150-51, 159.  During the ground training, Plaintiff claims that the instructor made fun of his accent -- laughing when he spoke.  *Id.* at 159-62.  Plaintiff also testified that the instructor commented "PSA does not discriminate" while looking at him.  *Id.* at 159-60.  He successfully completed the classroom component and proceeded to the simulator training.  *Id.* at 170-71; Glenn Decl. ¶ 7.

APD Captain Christner administered Plaintiff's third check ride on May 16, 2009 with ALPA representative, Joseph Connolly, observing.  Occhione Dep. 172-73, 178; Christner Decl. ¶ 3, Doc. 38-6.  According to Captain Christner, Plaintiff committed several errors. Christner Decl. ¶¶ 4-6 & ex.1. For example, he "[left] the windshield heat on during all ground operations[,] which could have caused the windshield to delaminate, permitt[ed] the removal of external power before it was turned off, and demonstrat[ed] a lack of knowledge of procedure regarding minimal visibility."  *Id.* ¶ 4.  Due to his poor performance, Plaintiff failed his third check ride.  Christner Decl. ¶ 7.

Plaintiff testified that there were no specific comments or incidents during the third check ride that he considered to be discriminatory or retaliatory.  *Id.* at 179.  Nonetheless, though he never told Captain Christner that he filed an EEOC charge, Plaintiff did accuse him of failing him because he was foreign.  *Id.* at 180-82.

ADP Captain Harris performed Plaintiff's fourth check ride on May 29, 2009.  *Id.* at 190; Harris Decl. ¶ 7.  ALPA representative, Joseph Connelly, and FAA representative, William Best, observed.  Occhione Dep. 190-92.  APD Captain Harris documented numerous errors committed by Plaintiff, such as "not properly setting up the flight management system, and not turning the lights on for taxi on the runway or for take off."  *Id.* ¶ 8 & ex. 1.  Additionally, when Plaintiff was

8

instructed to make a right turn from 330 to 350 degrees during the test, "[i]nstead of turning right only 20 degrees to 350 he made a full circle turning 380 degrees," and he did not realize his error until asked. *Id.* Accordingly, Captain Harris concluded that Plaintiff failed his fourth check ride. *Id.* ¶ 9. Plaintiff could not specify any incidents or comments during his fourth check ride that showed national origin discrimination or retaliation. Occhione Dep. 195, 200.

Following his fourth check ride, Captain Harris debriefed Plaintiff and explained why he failed the test. *Id.* at 194-95. FAA Inspector Best agreed with Captain Harris' assessment -- that Plaintiff failed. *Id.* at 196-97.

### F. PSA's Termination of Plaintiff

After reviewing Plaintiff's unsatisfactory performance in his check rides, PSA terminated him. Glenn Decl. ¶ 9; Occhione Dep. ex. 9. Plaintiff's last day of employment was June 1, 2009. Glenn Decl. ¶ 9; Occhione Dep. 26. According to PSA, Plaintiff's termination was consistent with its practice and the CBA. Fusi Decl. ¶¶ 11-13. Every PSA pilot who failed to upgrade to Captain after two attempts was terminated or resigned in lieu of termination. *Id.* ¶ 13. Specifically, PSA identified five pilots, including four from the United States, who were terminated or forced to resign after failing their second upgrade attempts in 2009. Glenn Decl. ¶¶ 11-12 & ex. 6.

Following Plaintiff's final check ride in May 2009, the FAA sent Plaintiff a letter seeking to re-examine his competency as a pilot. Occhione Dep. 198-201. Because Plaintiff refused to be re-examined, the FAA suspended his pilot's license on October 23, 2009. *Id.* at 208-09 & ex. 8. Plaintiff, represented by counsel, appealed the FAA's suspension of his pilot's license to the National Transportation Safety Board ("NTSB"). *Id.* at 217. Following a two-day hearing with twelve witnesses, the administrative law judge issued an initial decision upholding the suspension

9

pending his re-examination. *Id.* at 217-19 & ex. 12. The NTSB affirmed the administrative law judge's initial decision. *Id.* at 223 & ex. 15. The Fourth Circuit Court of Appeals likewise upheld the suspension of Plaintiff's license. *Id.* at 225-26 & ex. 17.

On June 4, 2009, Plaintiff filed a second charge with the EEOC, alleging national origin discrimination and retaliation. Glenn Decl. ¶ 14 & ex. 7. The EEOC issued a "right to sue" letter on October 12, 2010. *Id.* ¶ 15 & ex. 8.

Further, on August 3, 2009, Plaintiff filed an Aviation Investment and Reform Act for the 21st Century ("AIR 21") whistleblower retaliation complaint with the Occupational Safety and Health Administration ("OSHA"), alleging a conspiracy between the FAA and PSA employees to ruin his career. Fusi Decl.¶ 33 & ex. 6. On August 3, 2011, OSHA issued an Order finding no AIR 21 violation and dismissed the case. *Id.*

## II. ANALYSIS

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c). Defendant, as the moving party, has the initial burden. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to Plaintiff, the non-moving party, to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. At all times, the Court views the facts in a light most favorable to Plaintiff. *See id.* at 255.

Thus, if Plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," summary judgment must be entered against him. *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence is insufficient"; rather, there must be evidence upon which reasonable jurors could find,

by a preponderance of the evidence, that the plaintiff is entitled to a verdict. *Anderson*, 477 U.S. at 252. Further, the Court is not "obligated to wade through and search the entire record for some specific facts that might support [Plaintiff's] claim[s]." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

To begin, the Court notes that, in his Complaint, Plaintiff alleged discrimination and retaliation based on his race, national origin and/or citizenship status. *See* doc. 22 at PageID 163-65. Not only has Plaintiff failed to develop his citizenship and race claims in his response to Defendant's motion for summary judgment, *see id.*, the Court finds that these claims fail on the merits. Citizenship is not a protected class under Tittle VII, nor the Ohio Civil Rights Act. *See* 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code. Ann. § 4112.02(A); *see also Norbuta v. Loctite Corp*., 1 F. App'x 305, 311 (6th Cir. 2001). Additionally, his racial discrimination claim fails because as a Caucasian, he is a "majority" plaintiff, and he has failed to meet the additional requirements for a reverse discrimination claim. *See Murray v. Thistledown Racing Club Inc.*, 770 F.2d 63, 67-68 (6th Cir. 1985). Therefore, the Court will analyze Plaintiff's national origin discrimination, hostile work environment, and retaliation claims only.[9]

### A. National Origin Discrimination

As Plaintiff has not presented direct evidence of national origin discrimination,[10] the

---

[9]In deciding discrimination claims under Chapter 4112 of the Ohio Revised Code, Ohio courts generally apply case law interpreting Title VII. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Norbuta,* 1 F. App'x at 311*; Das v. Ohio State Univ.*, 115 F. Supp. 2d 885, 889 n. 2 (S.D. Ohio 2000). Accordingly, the Court will analyze Plaintiff's state and federal claims together, and all references in this opinion to Title VII equally apply to Chapter 4112.

[10]Direct evidence does not require any inferences. *See Younis v.Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). For example, direct evidence of discrimination would be an employer telling an employee, "I fired you because you are Italian." *Cf. Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Here, Plaintiff has not directly linked the alleged discriminatory remarks to his termination. *Cf. Younis*, 610 F.3d

11

*McDonnell Douglas* burden-shifting analysis applies, under which: (1) Plaintiff must establish a *prima facie* case of discrimination; (2) the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) if the employer meets this burden, Plaintiff must prove, by a preponderance of the evidence, that the reasons offered were a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004). At all times throughout the burden-shifting process, Plaintiff bears the burden of persuading the factfinder that PSA intentionally discriminated against him. *See DiCarlo*, 358 F.3d at 415.

To establish a *prima facie* case of discrimination with circumstantial evidence, Plaintiff must prove: (1) he was a member of a protected class; (2) he was subjected to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class, or was treated differently than similarly situated, non-protected employees. *Id.*

For the reasons set forth above, Plaintiff has failed to satisfy the third prong -- that he was qualified for the position of Captain at PSA -- as evidenced by his repeated failure of the required check rides. *Cf. Highfill v. City of Memphis*, 425 F. App'x 470, 473-74 (6th Cir. 2011).[11]

Additionally, Plaintiff has failed to bring forth evidence to satisfy the fourth prong -- that he was replaced by a person outside the protected class, or was treated differently than similarly

---

at 363.

[11]Despite Plaintiff's claims that he was successful in the First Officer position, the Court finds that he was no longer qualified to retain his First Officer position under PSA's policy -- if a pilot repeatedly fails the check ride after two attempts to upgrade to Captain, the pilot is not only denied the promotion, he is terminated from his current position. Plaintiff challenges the procedures under which he was tested -- claiming the tests were unfair. He does not challenge, nor does the Court find any suggestion that, the test itself was discriminatory or retaliatory. Plaintiff voluntarily applied to upgrade to Captain, knowing that he had to pass a check ride in order to successfully do so. *See* Occhione Dep. 150-51.

12

situated, non-protected employees. *Id.* Plaintiff has not identified any pilots who "replaced" him. An employee is not "replaced" when his job duties are redistributed among existing employees. *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1115 (6th Cir. 2001).

Likewise, despite ample opportunity to obtain such information during discovery, Plaintiff has not shown that he was treated differently than any similarly situated, non-protected PSA employees, *i.e.,* by identifying a non-Italian First Officer that failed two attempts to upgrade to Captain, yet was not terminated or forced to resigned.[12] In his deposition, Plaintiff testified that he heard "rumors" of one such pilot, Occhione Dep. 246, but he has not substantiated that rumor with admissible summary judgment evidence. *See* doc. 42. To the contrary, PSA submitted sworn testimony that each and every PSA pilot who failed two upgrade attempts was terminated or forced to resign. *See* Fusi Decl. ¶¶ 1, 13. Moreover, PSA submitted the names of every pilot who failed two upgrade attempts in 2008 and 2009, showing they all were terminated or resigned. Glenn Decl. ¶ 11 & ex. 6.

Further, even assuming, *arguendo*, that Plaintiff could establish a *prima facie* case, his national origin discrimination claims still fail on summary judgment. PSA has articulated a legitimate, non-discriminatory reason for terminating him -- his failure to successfully upgrade to Captain, despite having four opportunities to pass the required examination. *See* Occhione Dep. ex. 9; Glenn ¶ 9.

Therefore, Plaintiff must show, by a preponderance of the evidence, that PSA's proffered

---

[12] Plaintiff argues that he cannot provide this information because Defendant refused to respond to his discovery requests. *See* doc. 42 at PageID 522-23. However, as evidenced by Plaintiff's own exhibit to his memorandum in opposition, Defendant did produce the required information. *See* doc. 42-36. Further, to the extent that Plaintiff disputes Defendant's production of documents and objections to his interrogatories, Plaintiff should have filed a motion to compel under Civil Rule 37 during the discovery period.

reason for terminating him was a pretext for discrimination. *See DiCarlo*, 358 F.3d at 414-15. Plaintiff may show the proffered reason (1) has no basis in fact, (2) did not actually motivate his termination, or (3) was insufficient to warrant termination. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). To carry his summary judgment burden, Plaintiff "must produce sufficient evidence from which a jury could reasonably doubt [PSA's] explanation of why it fired [him]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Plaintiff disputes whether he was properly evaluated during his check rides. In essence, he asserts that PSA's reason for his termination had no basis in fact. However, the determinative issue is not whether Plaintiff's check rides were properly administered, but whether PSA honestly believed that he failed properly administered check rides. In the Sixth Circuit, as long as an employer honestly believed in its proffered reason for termination, an employee cannot establish pretext, even if the facts are later shown to be incorrect. *Majewski*, 274 F.3d at 1117. An employer need only demonstrate that it "reasonably relied 'on the particular facts that were before it at the time the decision was made.'" *Id.* (quoting *Smith*, 155 F.3d at 807).

Here, PSA has demonstrated that it honestly believed in its reason for terminating Plaintiff. PSA presented sworn testimony -- from the ADP's who evaluated Plaintiff in his second, third, and fourth check rides -- laying out in detail Plaintiff's numerous errors during the evaluations. *See* Harris Decl. ¶¶ 3-9 & exs. 1-2; Christner Decl. ¶¶ 3-7 & ex. 1. In addition, there were outside observers in Plaintiff's check rides -- an ALPA representative and a FAA representative. Occhione Dep. 178, 190-97. Thus, Plaintiff cannot establish pretext on this ground.

To establish that PSA was not actually motivated by its proffered reason, Plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely that

not' that the employer's explanation is a pretext, coverup." *Rusell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008). In light of the substantial evidence that Plaintiff committed numerous errors in each of his four check rides, the stray comments concerning Plaintiff's national origin -- to which Plaintiff testified in his deposition -- do not overcome PSA's proffered reason to show that it actually had a discriminatory motive in terminating Plaintiff. *Cf. Grain v. Trinity Health*, 431 F. App'x 434, 451 (6th Cir. 2011).

Likewise, it is undisputed that PSA had a sufficient reason to terminate Plaintiff. *See Russell*, 537 F.3d at 607. Plaintiff had four opportunities to demonstrate his proficiency to be a Captain, yet failed every time; and he was aware that, under the CBA, he was only guaranteed two attempts to apply for a Captain position. Occhione Dep. 100-02. Moreover, Plaintiff has not contradicted PSA's evidence that it has repeatedly and consistently terminated employees for failing two upgrade attempts. Fusi Decl. ¶ 13; Glenn Decl. ¶ 11 & ex. 6.

Therefore, having failed to produce evidence from which a reasonable juror could infer that he was the victim of intentional discrimination, Plaintiff has failed to satisfy his summary judgment burden, and PSA is entitled to summary judgment on his state and federal national origin discrimination claims.

### B. Hostile Work Environment[13]

To survive summary judgment on his hostile work environment claim, Plaintiff must adduce sufficient evidence to demonstrate that his workplace was "permeated with discriminatory

---

[13]Defendant argues that Plaintiff's hostile work environment claim is procedurally barred for failing to adequately assert that claim in his EEOC charge. *See* doc. 38-1 at PAGEID 303 n.8. However, filing of an EEOC charge is not a jurisdictional prerequisite, *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir.1989); and, as discussed herein, the Court finds that Plaintiff's hostile work environment claim fails on summary judgment on the merits. Further, Ohio law does not require exhaustion of administrative remedies. *See Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002).

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). The "severe or pervasive" element involves an objective and subjective inquiry -- Plaintiff must show both that a reasonable person would find the conduct hostile or abusive, and he subjectively perceived it to be so. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009). In determining whether Plaintiff has made such a showing, the Court should consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 515 (quoting *Harris*, 510 U.S. at 23).

Here, Plaintiff has produced insufficient evidence to show that his workplace environment was sufficiently severe or pervasive to create an actionable hostile work environment. The Court has carefully reviewed Plaintiff's deposition testimony. Plaintiff testified to the following incidents over the approximately five years he was employed at PSA: (1) various PSA employees made fun of his accent, and acted as if they could not understand him, Occhione Dep. 94-95, 108-09, 159-62; (2) a few unspecified jokes were made, *id.* at 92-93; (3) he was called "hard headed," *id.* at 108-09; (4) he was told that he looked like a "hit man," *id.* at 123-25; and (5) an employee said, "police are sh_t" in Italian to him, *id.* at 144. In addition, Plaintiff mentioned a few comments that he did not find subjectively offensive. *See id.* at 120-21, 164-65. The Court finds that these occasional and stray comments do not arise to a hostile work environment in violation of Title VII. *Cf. Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 F. App'x 747, 750-51 (6th Cir. 2005). Accordingly, summary judgment is appropriate on Plaintiff's hostile work environment claim.

### C. Retaliation

To meet his summary judgment burden on his retaliation claim, Plaintiff must show that there are genuine disputes of material fact that: (1) Plaintiff engaged in a protected activity; (2) the decisionmaker had knowledge of the protected activity; (3) Plaintiff took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Morris*, 201 F.3d at 792. Plaintiff maintains that, as retaliation for sending the letter to Human Resources and filing the EEOC charge, PSA refused to promote him to Captain and then terminated him.[14] Despite months of discovery, however, Plaintiff has failed to satisfy his summary judgment burden on the second and fourth prongs.

Plaintiff has not proven that the decisionmakers -- the PSA officials that decided that Plaintiff failed the check rides and those that decided he should be terminated -- knew of the letter or the EEOC charge. Indeed, Captain Harris and Captain Christner -- who failed Plaintiff in his check rides -- submitted sworn testimony that they did not know that Plaintiff had complained of discrimination when making their decision. Harris Decl. ¶ 11; Christner Decl. ¶ 9. Plaintiff has no evidence to show otherwise. Occhione Dep. 182, 197. Further, PSA has presented undisputed evidence that it has consistently applied its policy of terminating pilots who failed to successfully

---

[14]Plaintiff also argues that PSA retaliated against him by randomly drug testing him. Occhione Dep. 230-31. However, because it is undisputed that a third party's computer program randomly selects which PSA employees are drug tested, *id.*; Glenn Decl. ¶ 16, Plaintiff cannot prove retaliation on that basis. Plaintiff additionally argues that PSA retaliated against him because it denied his unemployment compensation claim, though he suggests that he perceived it to be retaliation for filing the safety complaint with the FAA, not the EEOC charge. Occhione Dep. 231-35. Under Ohio law, an individual is ineligible for unemployment benefits it he or she was discharged for "just cause" in connection with his or her work. Ohio Rev. Code. § 4141.29(D)(2)(a). Given that the FAA suspended Plaintiff's pilot's license pending re-examination after he failed his final check ride, the Court finds that denying of unemployment benefits does not constitute circumstantial evidence of retaliation. Moreover, Plaintiff has failed to come forward with summary judgment evidence to substantiate his deposition testimony that PSA did not contest other pilots' unemployment claims. *See* Occhione Dep. 233-34.

17

upgrade to Captain after two attempts. *See* Fusi Decl. ¶ 13.

Moreover, Plaintiff's retaliation claim fails because he has not established that his protected activity is causally related to PSA's decision to not promote and terminate him. More than one year passed between Plaintiff's protected activity and the adverse employment actions: he sent a letter to the PSA Director of Human Resources, complaining of discrimination after his first upgrade failure in 2007, Occhione Dep. 235-36; he filed his first EEOC charge in March 2008, Glenn Decl. ¶ 6 & ex. 4; and he failed his fourth check ride on May 29, 2009 and was terminated shortly thereafter, *id.* ¶¶ 8-9. In a case such as this, where there is no close temporal proximity between the protected activity and subsequent adverse action,[15] Plaintiff must point to circumstantial evidence of retaliatory conduct to establish the necessary causal connection. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Plaintiff has failed to do so here. *Cf. Evans v. Prospect Airport Servs.*, 286 F. App'x 889, 896 (6th Cir. 2008).

Therefore, because Plaintiff failed to establish two elements of his retaliation claim -- the decisionmakers' knowledge and a causal connection -- Defendant is entitled to summary judgment.

### III. RECOMMENDATION

For the foregoing reasons, the Court finds that Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims. *See* Fed. R. Civ. P. 56(c). Accordingly, Defendant's motion for summary judgment should be granted.

---

[15] While close temporal proximity alone may be sufficient to show a causal connection on summary judgment in certain cases, the time elapsed between the protected activity and the adverse action is usually no more than six months. *See, e.g., DiCarlo*, 358 F.3d at 421-22 (21 days); *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 600-01 (6th Cir. 2009)(2 months); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (13 days); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (4 months is "insufficient to support an inference of retaliation").

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendant's motion for summary judgment (doc. 38) be **GRANTED;** and

2. This case be **CLOSED.**


March 2, 2012                                                                 s/ **Michael J. Newman**
                                                                              United States Magistrate Judge

## **NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B)(C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).